J-S42021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JESSICA AMBER FROEHLICH | : | No. 606 WDA 2022 |

Appeal from the Suppression Order Entered April 22, 2022
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0002135-2021

BEFORE:   BOWES, J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                **FILED: December 21, 2023**

The Commonwealth of Pennsylvania appeals from an order entered April 22, 2022, which granted a motion to suppress filed by Appellee, Jessica Amber Froehlich.  The Commonwealth contends that the suppression court abused its discretion or committed an error of law in granting Appellee's motion.  We affirm, in part, vacate, in part, and remand for proceedings consistent with this memorandum.

The following facts were revealed at the December 14, 2021 suppression hearing.  On August 13, 2021, Officer Michael Attalla and Officer Michael Cacchione of the Erie Police Department were on duty near East 6th Street and Perry Street in Erie, Pennsylvania.  N.T. Suppression Hearing, 12/14/21, at 4-5.  At approximately 2:04 a.m., the two officers were in a marked patrol

_____

[*] Retired Senior Judge assigned to the Superior Court.

vehicle "traveling eastbound on East 6th Street" directly behind a black Ford Escape SUV. *Id.* at 5. At that time, the officers ran the Ford Escape's registration and discovered it had expired. *Id.* The officers initiated a traffic stop of the Ford Escape by activating the patrol vehicle's "overhead emergency lights, and sirens." *Id.* Officers Cacchione and Attalla then approached the Ford Escape simultaneously, with "Officer Cacchione approaching the driver side and Officer Attalla approaching the passenger side." Suppression Court Opinion, 4/22/22, at 5. "Upon [their] initial approach, [the officers] utilized [their] flashlights and illuminated the interior of the [Ford Escape]. At which time, [the officers] observed three females inside the vehicle," one in the driver's seat, one in the passenger's seat, and one, Appellee, "in the back seat alone." N.T. Suppression Hearing, 12/14/21, at 6.

The suppression court summarized the officers' subsequent interaction with the occupants of the Ford Escape, including Appellee, as follows:

> Immediately upon reaching the vehicle, Officer Attalla is heard ask[ing:] "Do you have any [identification] on you[?]" It is not entirely clear from the footage, but that inquiry appears to be directed to the occupant of the front passenger seat. At approximately the same time, Officer Cacchione can be heard telling the driver that he stopped her because her [registration] was expired. Officer Attalla then proceeded to ask [Appellee,] who was seated in the rear seat on the driver's side, "What [is] up with your friend up here?" [Appellee] responded to Officer's question laughing and saying, "Sorry, what?" At that point, Officer Attalla noticed a gun in the seat pocket of the passenger seat and is heard to say[, "Hey, Officer Cacchione,] we got a 26[fn*3] here. Everyone[,] just keep your hands up. Do [not] move." Immediately thereafter, Officer [Cacchione] asked "Whose gun is that?" [Appellee] responded, "That [is] me. That [is] my gun." Officer [Cacchione] then proceeded to ask

[Appellee] if she had a gun permit. [Appellee] responded that she did, and Officer [Cacchione] asked to see it. While Officer [Cacchione] was asking for [Appellee's] gun permit, Officer Attalla opened the rear passenger door and removed the gun from the vehicle. After Officer Attalla [] removed the gun, [Appellee] could be heard to say that she did not think she had her permit with her. While [Appellee] looked for her permit in her purse, the driver inquired about what was going on. Officer Cacchione told the driver, "If [Appellee is] gonna [sic] have a gun in the car she needs a permit to carry the gun." Officer Cacchione then asked "just" for [Appellee's] driver's license. He also obtained the driver's license from the driver of the vehicle and then called in two radio checks – a firearms permit check for [Appellee] and a driver's license check for the driver.

[fn*3] At the suppression hearing, Officer Cacchione testified that the code "26" was a reference to a firearm.

Suppression Court Opinion, 4/22/22, at 5-6 (some footnotes omitted).[1] The results of the license and firearm checks revealed that Appellee's concealed carry permit had recently been revoked. N.T. Suppression Hearing, 12/14/21, at 12. As such, the officers asked Appellee to exit the vehicle, placed Appellee

---

[1] During the suppression hearing, the Commonwealth admitted Officer Attalla's and Officer Cacchione's body camera footage as exhibits. **See** N.T. Suppression Hearing, 12/14/21, at 14 and 26. The Commonwealth, however, failed to include either exhibit in the certified record. Moreover, the Commonwealth failed to file either exhibit with the clerk of courts in Erie County. "It is black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in [the] case." **Eichman v. McKeon**, 824 A.2d 305, 316 (Pa. Super. 2003) (citation omitted). Indeed, it is equally settled that it "is the responsibility of the appellant to provide a complete record to the appellate court on appeal" and that any "document which is not part of the official certified record is considered to be non-existent." **Id.** (citation omitted). Due to the Commonwealth's failure, we are precluded from reviewing the body camera footage ourselves and are bound by the suppression court's description of the sequence of events in this matter.

under arrest, and then searched her person, as well as the purse she was carrying, and discovered a plastic bag containing a small amount of marijuana therein. *Id***.** at 11, 18, and 31; *see also* Appellee's Omnibus Motion to Suppress, 11/5/21, at 5.

The Commonwealth charged Appellee with firearms not to be carried without a license; obstructing administration of law or other governmental function; possession of marijuana; and possession of drug paraphernalia.[2] On November 11, 2021, Appellee filed an omnibus motion to suppress. In Appellee's motion, she argued the officers subjected her to an unconstitutional detention when they asked her for documentation supporting her authority to carry a firearm, because, at that time, "the only information in the [o]fficers' possession was that [Appellee] possessed a firearm." Appellee's Omnibus Motion to Suppress, 11/5/21, at 5. Appellee claimed that, based upon our Supreme Court's decision *Commonwealth v. Hicks*, 208 A.3d 916 (Pa. 2019) and this Court's decision in *Commonwealth v. Malloy*, 257 A.3d 142 (Pa. Super. 2021), "that information 'was insufficient as a matter of law to establish reasonable suspicion.'" *Id***.**, *quoting* *Malloy*, 257 A.3d at 155. As such, Appellee asked the court to suppress all evidence obtained from the unconstitutional detention, as well as the subsequent search of Appellee's person and effects. Appellee's Omnibus Motion to Suppress, 11/5/21, at 5.

_____

[2] 18 Pa.C.S.A. §§ 6106(a), 5101 and 35 P.S. §§ 780-113(a)(16) and (a)(32), respectively.

A suppression hearing was held on December 14, 2021, during which Officers Cacchione and Attalla testified. *See* N.T. Suppression Hearing, 12/14/21, at 1-38. On February 10, 2022, the suppression court granted Appellee's motion. Suppression Court Opinion, 2/10/22, at 1-4. In particular, the suppression court held that, while the initial traffic stop was valid, the "continued detention and questioning [of Appellee] after the gun was secured[] 'transformed the officers' pursuit of [Appellee's] firearm credentials into an 'inquiry exclusively aimed at collecting evidence of collateral wrongdoing.'" *Id.* at 4, *quoting* *Malloy*, 257 A.3d at 153. Because the officers lacked the "requisite reasonable suspicion of criminal activity to support that continued detention," the suppression court held that Appellee was subjected to an unconstitutional search and seizure. *Id.* Accordingly, the suppression court granted Appellee's suppression motion, holding that the "evidence obtained as a result of that detention [must be] suppressed." *Id.*[3]

Thereafter, on February 28, 2022, the Commonwealth filed a motion for clarification, asking the court to explain which, if any, of the following evidence could be admitted in light of the suppression court's ruling on Appellee's suppression motion:

    a. The initial observation of the firearm in question by [Officer] Attalla;

    b. The actual seizure of the firearm itself;

---

[3] We read the court's February 10, 2022 order to include the small plastic bag containing marijuana which supported Appellee's possession of marijuana and possession of drug paraphernalia charges.

c. The identity of [Appellee]; and

d. [Appellee's] statements made prior to the initiation of the inquiry.

Commonwealth's Motion for Clarification, 2/28/22, at *2 (unpaginated).[4]  On March 2, 2022, the suppression court scheduled a hearing on the Commonwealth's motion and, on March 9, 2022, the court conducted an in-chambers hearing.[5]  The court issued a supplemental opinion on April 22,

_____

[4] The Commonwealth did not seek clarification regarding the court's suppression of the small plastic bag of marijuana.

[5] Under Pennsylvania law, "a court upon notice to the parties may modify or rescind any order within 30 days after its entry . . . if no appeal from such an order has been taken or allowed."  42 Pa.C.S.A. § 5505.  This Court previously explained:

> "Under [S]ection 5505, the trial court has broad discretion to modify or rescind an order, and this power may be exercised *sua sponte* or invoked pursuant to a party's motion for reconsideration."  "[T]he trial court may consider a motion for reconsideration only if the motion for reconsideration is filed within thirty days of the entry of the disputed order."  "The mere filing of a motion for reconsideration, however, is insufficient to toll the [reconsideration] period."  "If the trial court fails to grant reconsideration expressly within the prescribed 30 days, it loses the power to act upon both the [motion] and the original order."

*PNC Bank, N.A. v. Unknown Heirs*, 929 A.2d 219, 226 (Pa. Super. 2007) (internal citations omitted).  In this instance, the court scheduled a hearing on the Commonwealth's motion for clarification on March 2, 2022.  Then, during the in-chambers hearing on March 9, 2022, the court expressly agreed that clarification "was appropriate," permitted further argument, and explained it would issue a subsequent ruling clarifying and finalizing its February 10, 2022 order.  N.T. Hearing, 3/9/22, at 3-4 and 28-29.  Accordingly, we conclude the court expressly and timely indicated its intent to modify the February 10, 2022 within 30 days.

2022, clarifying and finalizing its previous order. In particular, the suppression court stated it "believe[d] that **Malloy** require[d suppression of] all evidence that was obtained after the officers began an investigative detention into [Appellee's] firearm credentials." Suppression Court Opinion, 4/22/22, at 4. The suppression court held that the investigative detention began after Officer Cacchione asked: "Whose gun is that?" **Id.** at 8. As such, the court clarified that its suppression order included Appellee's identification, Appellee's admission that the firearm was hers, the firearm, and the results of the firearm license check. **Id.** at 8-9 (emphasis omitted). The court, however, explained the following evidence was not subject to suppression:

> a. [T]he initial observation of the firearm in question by [Officer] Attalla[;]
>
> b. [T]he observation of and the seizure of the firearm in question[;]
>
> c. [T]he observations of the officers about the appearance of [Appellee; and]
>
> d. [Appellee's] statements made [prior] to Officer Cacchione's question "Whose gun is that[?"]

**Id.** at 9 (emphasis omitted).

On May 20, 2022, the Commonwealth timely filed a notice of appeal from the suppression court's April 22, 2022 order and, within it, the Commonwealth properly certified that the order "terminate[d] or substantially handicap[ped] the prosecution." Commonwealth's Notice of Appeal, 5/20/22,

at 1; *see also* Pa.R.A.P. 311(d).[6]  The Commonwealth raises the following issue on appeal:

> Whether the [suppression] court erred as a matter of law or abused its discretion by finding that the Commonwealth violated [Appellee's] rights under the Pennsylvania and United States['] Constitutions when, after [Appellee's] firearm was seized during a vehicle stop, the Commonwealth continued to question [Appellee] as to [her] identity and made [an] inquiry into the status of [Appellee's] firearm licensing?

Commonwealth's Brief at 3.

Herein, the Commonwealth argues that, upon conducting a valid traffic stop and subsequently discovering the firearm in plain view, the officers were permitted to investigate Appellee's license status.  Commonwealth's Brief at 8.  In support of this claim, the Commonwealth cites the policy favoring officer safety, alleging that the vehicle stop in question took place in a "high-crime, shots fired area."  *Id.* at 10.  In addition, the Commonwealth argues that, for purposes of public policy, if a police officer discovers a firearm in plain view, they must always be allowed to check an individual's license status otherwise

---

[6] "Certification of pretrial appeals by the Commonwealth [under Pennsylvania Rule of Appellate Procedure 311(d)] is an exception to the requirement that appeals may be taken only from final orders."  *Commonwealth v. Cosnek*, 836 A.2d 871, 873 (Pa. 2003).  As our Supreme Court has explained, "[w]hen a pretrial motion removes evidence from the Commonwealth's case, only the prosecutor can judge whether that evidence substantially handicaps his ability to prove every essential element of his case.  Additionally, only the prosecutor can judge whether he can meet his constitutional burden of proving his case without that evidence."  *Id.* at 875 (citations omitted).  In following, the Supreme Court has held that the Commonwealth may utilize Rule 311(d) to immediately appeal "a pretrial ruling [that] results in the suppression, preclusion or exclusion of Commonwealth evidence."  *Id.* at 877.

they will be required to "hand back a firearm to a person in a vehicle without knowing their permit status" which will impact not only officer safety, but the safety of the community at large. *Id.* at 12. Based upon the foregoing, the Commonwealth asks this Court to reverse the order granting Appellee's motion to suppress.

When reviewing a challenge to a suppression ruling, our standard of review is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the [defense] prevailed before the suppression court, we may consider only the evidence of the [defense] and so much of the evidence for the [Commonwealth] as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [trial court's legal conclusions] are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa. Super. 2017) (citation omitted and formatting altered).

"The Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of the people to be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures." *Commonwealth v. Luczki*, 212 A.3d 530, 542 (Pa. Super. 2019) (citation omitted). "To secure the right of citizens

to be free from unreasonable search and seizure, courts in Pennsylvania require law enforcement officers to demonstrate ascending levels of suspicion to justify their interactions with citizens to the extent those interactions compromise individual liberty." *Id.* (citation omitted).

In general, "a motor vehicle stop is an investigative detention." ***Commonwealth v. Ross***, 297 A.3d 787, 792 (Pa. Super. 2023), *citing* ***Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023). If a lawful vehicle stop transitions into a collateral investigation of a secondary, non-traffic offense, the police must have independent justification to support the newly-undertaken investigation; they may not simply expand the initial traffic stop. ***See Rodriguez v. United States***, 575 U.S. 348 (2015) (original brackets omitted).

This Court previously described the scope and permissible duration of a motor vehicle stop as follows:

> The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the [vehicular] infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate that purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

> A traffic stop "can become unlawful if it is prolonged beyond the time reasonably required to complete the mission" of issuing a warning ticket. … An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the] stop." Typically, such inquiries involve checking [identification and] determining whether there are outstanding warrants[.] These checks serve the same objective as enforcement of the traffic code: ensuring [roadway safety. *See Rodriguez* at 354 (original brackets omitted).]

In sum, within the context of a lawful traffic stop, *Rodriguez* permits "mission related" inquiries addressed to the traffic violations which originally prompted the detention, as well as incidental inquiries aimed at ensuring the safe and responsible operation of vehicles on the highway. *See id.* This latter category includes such things as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.*

*Malloy*, 257 A.3d at 149–150.

Our prior cases have also identified examples of certain steps law enforcement personnel may take, without independent justification, to ensure their safety during a traffic stop. We emphasized that these actions do not impermissibly extend the length of such a detention.

[O]ut of concern for officer safety, Pennsylvania search and seizure jurisprudence [] permits certain limited intrusions upon the liberty of passengers in lawfully detained vehicles. Hence, officers may order passengers to remain in a car for the duration of a lawful stop. *See Commonwealth v. Pratt*, 930 A.2d 561, 567 (Pa. Super. 2007) ("police officer may lawfully order a passenger who has exited and/or attempted to walk away from a lawfully stopped vehicle to re-enter and remain in the vehicle until the traffic stop is completed[] without offending the passenger's rights under the Fourth Amendment"), *appeal denied*, 946 A.2d 686 (Pa. 2008). Law enforcement officials may also inquire about the presence of weapons. *See Commonwealth v. Clinton*, 905 A.2d 1026, 1031 (Pa. Super. 2006) (officer's inquiry regarding presence of weapons during lawful traffic stop reasonably furthered interest in officer safety and constituted tolerable, minimal intrusion), *appeal denied*,

- 11 -

934 A.2d 71 (Pa. 2007). Lastly, police officials may compel passengers to exit a lawfully stopped vehicle. ***See Commonwealth v. Rodriguez***, 695 A.2d 864, 868-869 (Pa. Super. 1997) (Fourth Amendment permits police to ask both drivers and passengers to alight from lawfully stopped vehicles without reasonable suspicion that criminal activity is afoot). The [justifications for carrying] out these actions do not, in and of themselves, expand the grounds for detaining or investigating passengers who are merely present in a lawfully stopped vehicle. ***See Maryland v. Wilson***, 519 U.S. 408 (1997) (reasoning that officer's authority to order passengers out of lawfully stopped vehicle stems from potential safety risks to officers and not from independent grounds to detain passengers).

***Id.*** at 150.

Search and seizure jurisprudence has been careful, however, to separate legitimate, mission-related inquiries and measures undertaken to ensure officer safety from more intrusive and constitutionally unjustified extensions of lawfully-initiated traffic detentions. Hence,

not all inquiries during a traffic stop qualify as ordinarily incident to the stop's mission, as measures aimed at finding evidence of other crimes or safety precautions taken to facilitate detours from the mission do not pass constitutional muster. ***See Rodriguez***, 575 U.S. at 355-56; ***see also Knowles v. Iowa***, 525 U.S. 113 (1998) (stating that "while the concern for officer safety in this context may justify the 'minimal' additional intrusion of ordering a driver and passengers out of the car, it does not by itself justify the often considerably greater intrusion attending a full field-type search.").

Recently, this Court applied the reasoning in ***Rodriguez*** regarding the "mission-related" questions during a traffic stop in [***Malloy***]. There, a police officer stopped a vehicle due to a missing license plate. ***See id.*** at 145. The vehicle had several occupants including Malloy, who was seated in the rear behind the driver. ***See id.*** The officer asked Malloy for identification, who in response, pulled out a lanyard from his hooded sweatshirt. ***See id.***

- 12 -

Upon observing the lanyard, the officer immediately asked Malloy whether he had a firearm. *See id*. The officer explained that "in his experience, it was common for people who worked in armed security positions at local bars to keep their identification badges in lanyards." *Id*.

Malloy replied that he possessed a firearm and worked as a security guard at a bar where he and the other occupants of the vehicle had just finished working. *See id*. The officer then secured the firearm for his safety and the safety of the other occupants of the vehicle. *See id*. Subsequently, the officer questioned Malloy regarding his firearm licensure status, and Malloy gave the officer an "Act 235" card. *See id*. at 146. The officer noticed the card had expired and thereafter confirmed that Malloy did not have a valid license to carry. *See id*. at 146. The officer then arrested Malloy but did not issue a citation to the driver of the vehicle. *See id*. Malloy filed a motion to suppress the firearm, which the trial court denied. *See id*. at 146-[1]47.

On appeal, this Court concluded that the trial court erred in failing to grant Malloy's suppression motion. *See id*. at 156. Initially, this Court found that the officer's stop of the vehicle was valid. *See id.* at 149. Further, this Court observed that the officer had the authority to ask Malloy about the presence of weapons or surrender the gun to the police. *See id.* at 152-[1]53. However, applying *Rodriguez*, the Court concluded that the officer's questions to Malloy regarding his authorization to possess the firearm were not "mission related" inquiries relating to the traffic violation. *See id*. at 150-53. We explained:

> once [the officer] secured the firearm, [Malloy's] legal authority to own or possess a gun clearly bore no discernible relationship to individual safety or security within the context of the traffic stop. Under these circumstances, where seizure of a firearm has substantially diminished the risk to officers and others who may be present during a lawful vehicle detention, we see no reason why the Fourth Amendment, in the absence of independent justification, suspicion, or cause, should tolerate even a 10- to 15-minute extension of a routine traffic stop for the investigation of a secondary criminal matter. Hence, the request challenged in this case does not fall within the category of actions the police may undertake during a

- 13 -

lawful traffic stop based solely on concerns for safety and security and without independent justification or cause.

*Id.* at 153; *see also id*. at 152 (noting "that a passenger's legal authority to own or possess a firearm is simply unrelated to a driver's authority to operate a motor vehicle, the existence of outstanding warrants against the driver, and whether a lawfully detained vehicle is properly registered or insured.").

Moreover, this Court found that the antecedent investigative detention of Malloy, which commenced when the officer restrained his liberty to ask about Malloy's authority to possess a firearm, was not supported by reasonable suspicion. *See id.* at 154-[1]55[, *citing* **Hicks**, 208 A.3d at 936] (holding that mere possession of a firearm did not establish reasonable suspicion to allow an officer to approach and detain an individual in order to investigate whether he or she was properly licensed to carry a firearm in public)[.] Therefore, this Court concluded that the evidence and any statements made by Malloy must be suppressed. *See id.* at 156.

*Ross*, 297 A.3d at 793-794 (parallel citations omitted).

A review of the certified record herein reveals that, after Officers Cacchione and Attalla initiated a traffic stop of the Ford Escape because of an expired registration, they approached the vehicle simultaneously. *See* Suppression Court Opinion, 4/22/22, at 5. "Officer Cacchione approached the driver's side and Officer Attalla approached the passenger side." *Id.* Officer Attalla asked the passenger of the vehicle for her identification and "then proceeded to ask [Appellee,] who was seated in the rear seat on the driver's side, 'What's up with your friend up here?'" *Id.* Appellee responded with a laugh. *Id.* As Officer Attalla was talking to Appellee, he noticed a firearm in the "seat pocket of the passenger seat," informed Officer Cacchione of the weapon, and ordered all individuals in the Ford Escape to "keep [their] hands

- 14 -

up" and not to move. *Id.* Immediately thereafter, Officer Cacchione asked whose firearm was in the backseat, to which Appellee responded: "That [is] me. That [is] my gun." *Id.* Officer Cacchione then asked Appellee whether she had a gun permit while Officer Attalla simultaneously opened the rear passenger door and secured the firearm. *Id.* Appellee responded that she had a permit, but it was not with her. *Id.* As such, Officer Cacchione "asked 'just' for [Appellee's] driver's license." *Id.* at 6. Appellee obliged and Officer Cacchione requested a firearm permit check for Appellee, which revealed that her license was revoked. *Id.* Based upon the foregoing, the officers demanded Appellee exit the vehicle and arrested her. N.T. Suppression Hearing, 12/14/21, at 11 and 31. The officers then conducted a search incident to arrest and discovered a plastic bag containing a small amount of marijuana in Appellee's purse. *Id.* at 18.

Herein, the suppression court initially held that "the officers [] were justified in stopping the vehicle in which [Appellee] was a passenger" because the officers discovered that the Ford Escape's registration was expired prior to initiating the stop. Suppression Court Opinion, 4/22/22, at 7-8; *see also* N.T. Suppression Hearing, 12/14/21, at 5. In addition, the trial court determined that, during the valid traffic stop, the officers observed the subject firearm in plain view and were permitted to secure the firearm for safety purposes. Suppression Court Opinion, 4/22/22, at 7-8. The court, however, explained that, pursuant to *Malloy*, the officers "needed an independent basis – beyond the reason for the traffic stop – to [establish reasonable grounds to] inquire

into [Appellee's] lawful ability to carry a firearm" after discovering that she was in possession of a firearm, which they secured. *Id.* at 8, *citing **Malloy***, 257 A.3d at 152-153. The suppression court therefore looked to whether the officers offered an independent basis to show whether Appellee was engaged in criminal activity and, hence, properly subjected to a detention allowing an inquiry into her legal authority to carry a firearm. As in **Malloy**, the suppression court determined that "the only fact the officers set forth to justify the investigative detention of [Appellee]" was her possession of the firearm itself. *Id.* Accordingly, the court suppressed "all evidence seized" once Officer Cacchione "asked the occupants whose gun was in the backseat." *Id.* Hence, the court suppressed the following: Appellee's admission, *i.e.*, Appellee's statements, "That [is] me," and "That [is] my gun," made in response to Officer Cacchione's inquiry; Appellee's identification; the results of the firearm license check; the firearm; and the plastic bag containing a small amount of marijuana found in Appellee's purse. *Id.*; **see also** Suppression Court Opinion, 2/10/22, at 4. Although we agree that **Malloy** compels suppression of the firearm, the results of the firearm license check, and the plastic bag of marijuana, we do not agree that Appellee's admission or her identity should have been suppressed.

We review the totality of circumstances in determining whether the officers had reasonable suspicion to investigate Appellee's legal authority to

possess a firearm in a concealed manner.[7] *See Commonwealth v. Raglin*, 178 A.3d 868, 872 (Pa. Super. 2018) (internal citations omitted), *quoting Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004). Applying this standard, the suppression court correctly held, consistent with *Hicks* and *Malloy*, that the firearm, the results of the firearm license check, together with the plastic bag of marijuana found in Appellee's purse, were subject to suppression. Indeed, as indicated above, the officers secured the firearm and then inquired into Appellee's license status. *See* Suppression Court Opinion, 4/22/22, at 5. Once the officers secured the firearm, they "essentially eliminated any immediate risk the weapon posed." *Malloy*, 257 A.3d at 153. Moreover, the officers immediately requested that Appellee produce a concealed carry permit once they confirmed that she possessed a firearm in a vehicle. At this moment, the officers were aware only that Appellee was in possession of a firearm and they could not "infer criminal activity merely from [Appellee's] possession of a concealed firearm in public." *Hicks*, 208 A.3d at 936. Hence, absent independent justification, suspicion, or cause, the police were not permitted to extend a valid traffic stop to undertake the investigation of a secondary criminal matter. *See Malloy*, 257 A.3d at 153.

Importantly, no evidence or circumstances presented at the suppression hearing reasonably supported the inference that Appellee's mere possession

---

[7] Since Appellee possessed the firearm in a vehicle, a concealed carry permit was required. *See* 18 Pa.C.S.A. § 6106(a) (requiring a valid license to carry a firearm in a vehicle).

of a firearm constituted a violation of criminal law. Indeed, there was no evidence that, prior to requesting Appellee's concealed carry license, the officers knew of Appellee's firearm's disability or that her license was revoked. *See Hicks*, 208 A.3d at 937 ("Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity."); *see also Ross*, 297 A.3d at 797 (noting that the police officer learned that the appellant's concealed carry license was revoked while checking his license and registration and without "further questioning"); (*Commonwealth v. Walton*, 2022 WL 4100765, at *6 (Pa. Super. 2022) unpublished memorandum) (upon discovery of a firearm during a protective frisk, Walton immediately and spontaneously admitted that he had a felony conviction which disqualified him from possessing a firearm, giving the police articulable facts which supported a reasonable suspicion that Walton's possession of the firearm was unlawful and that continued detention was justified). In addition, there was no evidence or testimony indicating that, upon observing the firearm in the vehicle, its incriminating nature was immediately apparent because of defaced serial numbers or the like. *See Commonwealth v. Smith*, 285 A.3d 328, 334 (Pa. Super. 2022) (holding that, because the officer testified that he observed features of the firearm indicating that it was a "ghost gun," its

"incriminating nature . . . was immediately apparent"). Moreover, the officers specifically testified that, upon approaching the vehicle, no one made furtive movements or otherwise acted aggressively toward them. *See* N.T. Suppression Hearing, 12/14/21, at 17-19 and 35-36; *compare Commonwealth v. Townsend*, 2021 WL 1761041 *1, *5 and *10 (Pa. Super. 2021) (unpublished memorandum) (explaining that the appellant "kick[ed] the firearm under the driver's seat" and provided the officer with reasonable suspicion that he was engaging in criminal activity, thereby justifying the investigative detention). While there was testimony that the traffic stop occurred in a high crime area, the officers admitted that they stopped the Ford Escape based solely upon the motor vehicle violation and not in response to an ongoing criminal investigation. *See* N.T. Suppression Hearing, 12/14/21, at 17 and 35-36; *see also Commonwealth v. Anderson*, 276 A.3d 282, 295 (Pa. Super. 2022) (explaining that a defendant's presence "in a high crime area" is a "factor that may be considered in determining whether a police officer possess reasonable suspicion" but is only a "single factor" and not dispositive).

It is therefore evident that Appellee's possession of the firearm in question, alone, served as the sole basis for the officer's decision to inquire into her license status. This fact is revealed, first, by Officer Cacchione's comment to the driver during the traffic stop, in which he stated: "If [Appellee is] gonna [sic] have a gun in the car she needs a permit to carry the gun." Suppression Court Opinion, 4/22/22 at 6. Second, and even more telling,

Officer Attalla admitted during the suppression hearing that the only reason the police checked Appellee's license status was because she "possess[ed] the firearm in the vehicle." N.T. Suppression Hearing, 12/14/21, at 19. Accordingly, we conclude that the officers impermissibly prolonged the initial investigative detention to obtain information "exclusively aimed at collecting evidence of collateral wrongdoing" without the requisite reasonable suspicion required under **Hicks**. **Malloy**, 257 A.3d at 153. Such action was a violation of Appellee's constitutional rights and, therefore, the firearm and the results of the firearm license check were correctly suppressed.[8] **See Hicks**, **supra**.

The suppression court, however, erroneously determined that **Malloy** compelled the suppression of Appellee's admission, *i.e.*, her statement indicating that the firearm was hers, as well as her identification. To the contrary, **Malloy** specifically held that, while executing a lawful traffic stop, a police officer is permitted to engage in "mission related" inquiries to ensure not only "safe and responsible operation of vehicles on the highway" but also "[o]ut of concern for officer safety." **Id.** at 150. This, taken together, suggests strongly that police may ask for a passenger's identification and, upon discovering the presence of a firearm, may request the owner to identify himself or herself as a function of preserving on-scene officer safety without

---

[8] We also conclude that the court correctly suppressed the marijuana found in Appellee's purse pursuant to the fruit of the poisonous tree doctrine. **See Commonwealth v. Shabezz**, 166 A.3d 278, 290 (Pa. 2017) ("Evidence constitutes fruit of the poisonous tree, and must be suppressed, if it was obtained by 'exploitation' of the illegality[.]"), *citing* **Wong Sun v. United States**, 371 U.S. 471 (1963).

- 20 -

independent constitutional justification. *Id.*; *see also Commonwealth v. Durr*, 32 A.3d 781, 784 (Pa. Super. 2011) ("We agreed and held that the police could inquire of a passenger's identity in a lawfully stopped vehicle without triggering any constitutional protection."). Thus, we conclude that the court erroneously suppressed Appellee's identification, as well as her admission indicating that she owned the firearm.

Before we conclude, however, we briefly address certain matters raised by the learned Dissent. In summary, the Dissent concludes that suppression is not warranted, finding this matter is factually distinct from both *Hicks* and *Malloy*. In addition, the Dissent, along with the Commonwealth on appeal, attempts to avoid suppression by raising claims of police policy. We will address each of these issues in turn.

Initially, our learned colleague notes that, in *Hicks*, our Supreme Court "overturned a longstanding rule, first announced by this Court in *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. 1991) (the "*Robinson* rule"), that 'possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him [or her] in order to investigate whether the person is properly licensed." Dissenting Memorandum at 3 (citations omitted). The Dissent, however, briefly remarks that, unlike the Appellee herein, "Hicks was not engaged in any illegal activity, but was merely viewed with a firearm." *Id.* Importantly, this statement seemingly overlooks the fact that, when the police initially

- 21 -

detained Hicks, they were unaware that "Hicks was licensed to carry a concealed firearm." *Hicks*, 208 A.3d at 363. Indeed, it was only "[u]pon further investigation," after the police stopped Hicks's vehicle, drew their weapons, restrained him, and conducted a license check, that the officers confirmed Hicks's licensure status. *Id.* Because the officer's engaged in such conduct based solely upon Hicks's possession of a firearm, without any reasonable suspicion that he possessed a gun unlawfully, our Supreme Court held that the officers violated Hick's Fourth Amendment rights. In all material respects relating to her possession of a firearm, Appellee here stood in the same position as both Hicks and Malloy: her mere possession of a firearm in public was the sole factor that led law enforcement to investigate the status of her gun permit.

We now turn to the Dissent's attempt to distinguish this matter from that of *Malloy*. In particular, our learned colleague believes that, unlike *Malloy*, the officers herein did not "unreasonabl[y] exten[d] the valid traffic stop." Dissenting Memorandum at 10. The Dissent points to the following facts to support this conclusion: Appellee's firearm was "immediately visible to the police officers," the investigation into Appellee's firearm status was conducted simultaneously with the driver's license check, and the stop itself only took approximately 11 minutes. *Id.* at 9. For this reason, the Dissent believes "this matter [is] factually [distinct] from *Malloy* and would reverse [suppression] on [this] basis." *Id.* at 11.

This attempt to distinguish this case fails for two reasons. First, it overlooks the fact that the officers herein engaged in two separate detentions: the first when they engaged in a valid traffic stop which is undisputed, the second when they commenced their investigation into Appellee's firearm status. The Dissent, without any citation to relevant authority, seemingly concludes that, as long at the traffic stop is brief, looking into a passenger's firearm status is a "mission related" inquiry that requires no independent justification. Respectfully, this position is unsupported by our caselaw. *See Commonwealth v. Kemp*, 961 A.2d 1247, 1258-1259 (Pa. Super. 2008) ("[R]outine constitutional analysis requires courts to utilize facts gathered during each escalating phase of a police investigation in determining whether police acted properly as the interaction between police and citizen proceeded towards an arrest.") (Bowes, J.). Indeed, *Hicks* instructs that, in order to detain Appellee and check her firearm status, the officers were required to have "individualized justification," apart from Appellee's mere possession of the firearm, to detain her, "otherwise, [the] search or seizure was constitutionally unreasonable." *Hicks*, 208 A.3d at 388. As discussed throughout, the officers herein lacked reasonable suspicion that Appellee, herself, was engaged in criminal activity or possessed a firearm unlawfully and, as such, their inquiry into Appellee's license status was unreasonable.

Second, the Dissent's position ignores the fact that *Hicks* squarely rejected the notion that, because a firearm permit check constitutes a "simple request" which, in turn, takes only a limited amount of time, it is

- 23 -

constitutionally permissible without independent constitutional justification. *Id.* at 393. In fact, the High Court stated:

> [T]he *Robinson* rule cannot be salvaged by any attempt to minimize the authority contemplated by characterizing the seizure as merely a "simple request" to check a license. A seizure is a seizure. That the purported basis for the seizure is simply to "check" whether the suspect is committing a crime does not diminish the constitutional significance of the encounter. It does not render it any less of a seizure; it simply renders it a seizure in the absence of a particularized basis for a finding of reasonable, articulable suspicion of criminal activity.

*Id.* Thus, the mere fact that the officers only took approximately 11 minutes to check Appellee's firearm status is of no consequence: "a seizure is a seizure" and must comport with constitutional requirements. *Id.*

Finally, we address the Dissent's claim that *Malloy*'s "rule" prohibits an officer from "explor[ing] the legality of the possession of a firearm seized during a valid traffic stop" and, in turn, compels police officer's to "give [the firearm] back to the individual when the stop is concluded without ascertaining whether the owner is entitled to possess it[.]" Dissenting Memorandum at 11. The Dissent claims that, to ensure officer safety, law enforcement must be granted the right to engage in the "unintrusive act of extending the valid stop for a minimal amount of time to ensure the officers are not re-arming someone barred from carrying a firearm while the officers remain vulnerable." *Id.* Notably, on appeal, the Commonwealth raises a similar argument, claiming that *Hicks* and *Malloy* require police officers to "hand [a confiscated] firearm back to a person having no idea whether or not they are permitted to have

the firearm concealed in a vehicle in which they are traveling" and that such a result is detrimental not only to officer safety, but also the community at large. Commonwealth's Brief at 12.

The Dissent and the Commonwealth, however, essentially contend that "police officers are not only entitled, but 'duty bound' to seize and investigate the licensing status of every individual who carries a concealed firearm in Pennsylvania." ***Hicks***, 208 A.3d at 379. This "radical position" was squarely rejected by our Supreme Court in ***Hicks***. ***Id***. In rejecting this proposition, the High Court astutely recognized:

> Crime and violence are ever-present threats in society, and it can be tempting to look to the government to provide protection from "dangerous" people with constant vigilance. However, the protections of the Fourth Amendment remain an essential bulwark against the overreaches and abuses of governmental authority over **all** individuals. Notwithstanding the dangers posed by the few, we must remain wary of the diminution of the core liberties that define our republic, even when the curtailment of individual liberty appears to serve an interest as paramount as public safety.

***Id***. at 403 (emphasis in original). Moreover, it must be noted that, contrary to the claims forwarded by the Dissent and the Commonwealth, ***Hicks*** and ***Malloy*** do not require officers to return a seized firearm to a potentially unlicensed individual, as neither decision embraces issues relating to police policy during citizen encounters. Instead, ***Hicks*** and ***Malloy*** address, solely, the issue of suppression, *i.e.*, the determination of whether a defendant may "escape the inculpatory thrust of evidence in hand . . . as a sanction to compel enforcement officers to respect the constitutional security of all of us under[,

*inter alia*,] the Fourth Amendment." **McCray v. Illinois**, 386 U.S. 300, 307 (1967); **see also United States v. Calandra**, 414 U.S. 338, 348-350 (1974) (explaining that a motion to suppress is a procedural vehicle utilized to enforce the exclusionary rule by "suppress[ing] [] the use of illegal seized evidence against the search victim."). Since a suppression proceeding simply determines whether seized evidence may be introduced against a defendant in a subsequent criminal trial, and not who retains a greater possessory interest in contraband seized during police encounters, the claims raised by the Dissent and the Commonwealth lie beyond the scope of the instant proceedings.

We therefore hold that the court correctly suppressed the firearm, the results of the firearm license check and the plastic bag of marijuana found in Appellee's purse. As such, we affirm the suppression court's April 22, 2022 order on this basis. We further hold, however, that the court erred in suppressing Appellee's identification and Appellee's statement: "That [is] me. That [is] my gun." We therefore vacate this aspect of suppression court's April 22, 2022 order and remand for proceeding consistent with this memorandum.

Affirmed, in part. Vacated and remanded, in part. Jurisdiction relinquished.

Judge Colins files a Concurring Statement.

Judge Bowes files a Dissenting Memorandum.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


12/21/2023